## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON


**LINDA WHALEY,**

     **Plaintiff,**

**-vs-**            **Case No. 3-:03-CV-363**

**CNF TRANSPORTATION, INC. LONG
TERM DISABILITY PLAN, et al.,**

             **Judge Thomas M. Rose**

     **Defendants.**

_____

### ENTRY AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #24) AND OVERRULING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #37)

_____

Plaintiff Linda Whaley ("Whaley") appeals the termination of the long term disability

("LTD") benefit that she was receiving pursuant to the Defendant CNF Transportation, Inc.

Long Term Disability Plan[1] (the "Plan"). Defendants CNF Transportation, Inc ("CNF") and

VPA, Inc. have been dismissed pursuant to stipulation of the Parties. (Doc. #17.) Whaley's claim

is for violation of the Employee Retirement Income Security Act ("ERISA") because the Plan

terminated the LTD benefits that she was receiving.

Now before the Court is Whaley's Motion for Judgment On the Pleadings (Doc. #24)

and the Plan's Motion for Summary Judgment (Doc. #26). A corrected version of the Plan's

Motion for Summary Judgment was filed with leave of Court (Doc. #37) and is considered in

lieu of the Plan's original Motion for Summary Judgment. Pursuant to the Sixth Circuit's

_____

[1]This Defendant is now known as CNF Inc. Long Term Disability Plan.

direction regarding ERISA actions, both Motions are considered Motions for Judgment On the Administrative Record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

The Cross-Motions for Judgment On the Administrative Record are fully briefed and now ripe for decision. In addition, the Administrative Record ("AR") and an Addendum thereto has been filed by the Plan. (Doc. #19, 23.) A background will first be set forth followed by the standard of review and an analysis of the Motions.

## BACKGROUND

The Plan provides LTD benefits for a Covered Employee who becomes totally disabled. (AR at C-0325.) The Parties do not dispute that Whaley was a Covered Employee. They do, however, dispute whether she was disabled.

The Plan provides that "Totally Disabled" and "Total Disability" mean that a Covered Employee:

(a) Has become wholly and continuously disabled as a result of an Illness or Injury;

(b) Is under the regular care of a physician ("M.D.") or osteopath ("D.O.") licensed by the recognized licensing authority of the state in which the M.D. or D.O. practices and acting within the scope of the M.D.'s or D.O.'s license; and

(c) Is prevented by reason of such Illness or Injury from engaging in any occupation, employment or job for wage or profit for which the Covered Employee is reasonably qualified by training, experience or education…

(AR at C-0325-26.)

Turning now to the claimant, Whaley was born on February 2, 1950 and was a Covered Employee under the Plan. (AR at C-0314.) She worked for Emery Worldwide Airlines ("EWA"),

a subsidiary of CNF, as an administrative employee in the transportation accounting department between September 19, 1983, and September 10, 1997. (Id.)

At the time she applied for LTD benefits, Whaley worked as an Administrative Specialist on accounts payable for jet fuel purchases. (Id.) According to the position description, the Administrative Specialist spends approximately 90% of his or her time sitting and 10% walking. (AR at C-1236.)

On September 10, 1997, Whaley took medical leave from her job. (AR at C-0314-15.) She claimed that she could no longer work because she had fibromyalgia, including chronic muscle pain, headaches, fatigue, IBS and memory and vision difficulties. (AR at C-0314.) She had been diagnosed with fibromyalgia approximately nine (9) years earlier. (AR at C-0315.) At the time she took medical leave, Whaley had three (3) years of college education and had unsuccessfully applied for more than twenty (20) jobs at EWA. (AR at C-0314.)

On November 21, 1997, Whaley applied to the Plan for LTD benefits. (AR at C-0315.) In the application, she complained of headaches; sharp pains in her skull, neck and shoulders; pain and numbness in both forearms, wrists and hands; pain and muscle spasms in her middle and lower back; stiffness and sharp pains in both hip joints; irritable bowel and bladder; short-term memory loss; dizziness and blurred vision; heart palpitations; shortness of breath; disruptive sleep and extreme fatigue. (AR at C-0315.) In addition to her own assessment, Whaley submitted an Attending Physician's Statement ("APS") from Dr. Fantasia, a chiropractor that indicated many of these same symptoms. (AR at C-0257-58.) Whaley also submitted an APS from Dr. Sanford Wolfe, D.O. (AR at C-0243-47.) Dr. Wolfe is a rheumatologist who had seen Whaley several times for fibromyalgia and first treated her for this affliction on April 17, 1997. (Id.)

Whaley's initial claim was evaluated by Voluntary Plan Administrators, Inc. ("VPA"). (Hart 10/13/04 Aff. ¶2; Ex. A.) The Plan's Administrative Committee had delegated the duty of claim review to VPA. (Id.)

On December 16, 1997, Whaley completed a Daily Activities Questionnaire which was subsequently submitted to VPA. (AR at C-0253-55.) In the Questionnaire, Whaley reported that she drove a car; did not need help getting in or out of the car; did grocery shopping once a week; prepared and cooked meals; cleaned the house and did laundry; sewed on occasion; walked her dogs on nice days; visited with family once or twice per week; and engaged in a number of outside social activities. (Id.) She also reported that she used heat on sore areas for about 2 hours per day and spent time reading with pillows to support her back and neck. (Id.) In addition, she reported that she had difficulty getting to sleep and woke frequently during the night. (Id.) Finally, she reported that she had trouble concentrating; had "constant pains that most days are merely dulled by medication;" and that she was "more limited in what she could do."(Id.)

Bernard Etcheverry of VPA, via a telephone conversation, denied Whaley's claim for LTD benefits on February 5, 1998. (AR at C-0227.) Whaley immediately appealed this denial. (Id.)

VPA then requested and received an Employability Assessment Report from Rehab West. (AR at C-0223.) After reviewing this Report, VPA concluded that Whaley could perform such jobs as procurement clerk, accounting clerk and administrative assistant. (AR at C-0011.) VPA also received additional medical information from Dr. Wolfe who had seen Whaley most recently on March 5, 1998. (AR at C-0212-13.)

Dr. Wolfe continued to diagnosed Whaley as having fibromyalgia and reported that Whaley's status was "ambulatory" and "improved." (Id.) Dr. Wolfe noted that Whaley was limited to sitting 2-3 hours per day with rests, standing for one hour per day with rests and walking for one hour per day with rests. (Id.) Dr. Wolfe also reported that Whaley could lift 1 to 10 pounds; she could do occasional bending, stooping, reaching above the shoulder and driving, but no climbing; and she had difficulty with memory and concentration due to the pain she was experiencing. (Id.) Finally, Dr. Wolfe indicated that Whaley's condition was expected to improve in the future. (Id.)

In addition to the APS, Dr. Wolfe wrote a letter to VPA on March 23, 1998, wherein he indicated that Whaley's condition had worsened since January 24, 1998. (AR at 186.) Dr. Wolfe reported that Whaley had some decrease in function. (Id.) He also reported that she had at least 12 out of 18 possible trigger points which is the medical diagnosis of fibromyalgia. Finally, Dr. Wolfe said that he was "optimistic" that Whaley's symptoms would decrease to the point where she could return to work but that it was difficult to estimate an exact date. (Id.)

VPA formally denied Whaley's claim on April 20, 1998. (AR at C-0172-74.) In the denial letter, VPA indicated that it had reviewed Whaley's application, the medical records and statements submitted by Whaley, and the Employability Assessment Report. (Id.) VPA concluded that, based upon a review of the evidence and Whaley's capacity to perform occupations for which she was reasonably qualified, she did not satisfy the definition of disability under the Plan as of November 10, 1997. (Id.)

On April 27, 1998, Whaley appealed VPA's denial of LTD benefits. (AR at C-0166-67.) In the appeal, Whaley asked VPA to consider the medical information supplied by Dr. Philip

Becker and Dr. Robert Fantasia in addition to that provided by Dr. Wolfe. (Id.) She further indicated that the fibromyalgia had worsened. (Id.) She wrote that, after sitting for any period longer than 20 to 30 minutes, the pain in her back, hips, legs, ankles and feet made walking very uncomfortable and sometimes almost impossible. (Id.) She further wrote that she had difficulty sitting, standing, walking or laying for periods longer than 10 to 20 minutes. (Id.) Finally, Whaley told VPA that she had completed the requirements for a Bachelor's Degree in March of 1998. (Id.)

Whaley then saw Dr. Becker, an osteopath, on July 8, 1998. (AR at C-0144-44A.) The APS provided to VPA by Dr. Becker after that visit indicates that Whaley had severe fibromyalgia and that he did not expect her condition to improve in the future. (Id.) Dr. Becker also reported that Whaley suffered from chronic pain in her shoulders and spine, including pelvis. (Id.)

VPA then evaluated Dr. Becker's APS and an intake report from United Behavioral Health dated September 24, 1997. (AR at C-0134, 0129, 0127.) The United Behavioral Health report indicated that Whaley complained of stress from being in school and from problems with her son. (Id.)

On September 21, 1998, VPA notified Whaley that her LTD claim was payable. (AR at C-0120.) Whaley's claim was approved through October 31, 1998. She was paid past due benefits from November 10, 1997, through August 31, 1998, as well as ongoing monthly benefits. (Id.)

In addition to granting benefits through October 31, 1998, VPA scheduled two independent medical examinations ("IMEs") to determine Whaley's current level of function.

(Id.) In a letter dated October 8, 1998, VPA notified Whaley that one IME would be with Dr.

Robert Schriber, a rheumatologist, and was to be conducted on October 22, 1998, and the other

IME would be with Dr. Dong Moon, a psychiatrist, and was to be conducted on October 28,

1998. (AR at C-0116.)

On November 4, 1998, VPA received an IME report from Dr. Moon who was board-

certified in psychiatry and neurology. (AR at C-0014, 0063-68.) Dr. Moon found no significant

psychiatric problems and no areas of limitation or restrictions from a psychiatric perspective.

(AR at C-0063-68.) Dr. Moon determined Whaley to be of average to above average intelligence

and reported that her attention span and calculation were good and her concentration and recall

were good. (Id.)

On November 25, 1998, VPA received an IME report from Dr. Schriber who was board-

certified in internal medicine with a subspecialty of rheumatology. (AR at C-0069.) Dr. Schriber

reported that he found no chronic inflammatory type rheumatic illness. (Id.) His physical

examination was negative, both as to the general examination and the musculoskeletal

examination. (Id.) Dr. Schriber said that he "suspected" that Whaley's complaints were largely

functional in nature and noted fibromyalgia syndrome. (Id.) Finally, Dr. Schriber stated that

fibromyalgia is generally considered non-disabling and the treatment involves the use of anti-

depressants and exercise and conditioning. (Id.)

On January 15, 1999, VPA terminated Whaley's LTD benefits. (AR at C-0091-92.) VPA

indicated that it based this determination upon the two IMEs as well as the previous

Employability Assessment Report. (Id.) VPA concluded that Whaley's benefits were being

terminated because she was able to perform work in sedentary jobs for which she was reasonably qualified. (Id.)

Whaley appealed the revocation of her LTD benefits. (AR at C-0061-62.) In a letter dated February 12, 1999, she indicated that there had been no change in her physical condition since she last communicated with VPA except that the fibromyalgia symptoms had worsened. (Id.) Whaley wrote that Dr. Moon's findings were no surprise since the brain is not affected by fibromyalgia. (Id.) She also wrote that Dr. Schriber's findings were no surprise since fibromyalgia cannot be detected by any proven tests other than identifying the tender points and ruling out all possible alternative physical conditions. (Id.) Finally, Whaley told VPA that her disability claim to the Social Security Administration had been rejected. (Id.)

VPA responded on February 23, 1999, that it would do a complete and thorough review of Whaley's claim. (AR at C-0088.) Whaley was told that she could submit additional evidence to support her claim if done within 30 days. (Id.)

On April 30, 1999, VPA requested updated records from Dr. Becker and the Kettering Arthritis Center. (AR at C-0079-80.) On that same day, VPA notified Whaley that they would be taking an additional 60 days to make a decision on her appeal. (AR at C-0081.)

The updated records provided by Dr. Becker indicated that Whaley continued to have osteopathic manipulation on a monthly basis. (AR at C-0071-76.) Dr. Becker also continued to diagnose Whaley with fibromyalgia. (Id.) Dr. Becker's updated records include a report from a whole body scan done on Whaley by the North Main Imaging and Diagnostic Center on April 13, 1999. (AR at C-0070.) This report indicates several foci of degenerative and arthritic changes. (Id.)

In June of 1999, VPA recommended to the Appeals Committee that Whaley's appeal be denied. (AR at C-0010-14.) VPA concluded that the medical information on file and the IMEs support the conclusion that Whaley could perform other occupations for which she is reasonably qualified as of when her LTD benefits were terminated on January 31, 1999. (Id.)

In a letter dated June 23, 1999, the Appeals Committee concurred with VPA's decision to terminate Whaley's LTD benefits. (AR at 0001-02.) The Appeals Committee found that there was no indication of a disease process which would preclude sedentary/light work activities. (Id.) Having set forth the background, the analysis turns to the standard of review.

## STANDARD OF REVIEW

When an ERISA plan administrator's decision to deny benefits is brought before a court, the court engages in a de novo review of the decision unless the benefit plan gives the plan administrator discretionary authority to determine eligibility or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan administrator is given no discretionary authority by the plan, review by the court is *de novo* with respect to both the factual determinations as well as the legal conclusions of the plan administrator. *Id.* Where there is a clear grant of discretion, the court applies an arbitrary and capricious standard of review to the administrator's decision to deny benefits. *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994). Finally, absent a procedural challenge to the administrator's decision, the court's review is limited to the administrative record of the benefit determination. *Wilkins,* 150 F.3d at 619.

The Sixth Circuit does not require a plan to use any magic words such as "discretionary" to create discretionary authority for a plan administrator in administering the plan. *Johnson v.*

*Eaton Corp.*, 970 F.2d 1569, n.2 (6th Cir. 1992). Yet the Sixth Circuit has consistently required "a clear grant of discretion [to the administrator]" before replacing its duty to engage in de novo review with the arbitrary and capricious standard. *Wulf*, 26 F.3d at 1373.

In this case, the Plan authorizes an Administrative Committee (the "Committee") to interpret the Plan, decide any questions about the rights of Covered Employees and Inactive Disabled Employees and in general administer the Plan. (AR at C-0335.) Any decision by the Committee within its authority is final and the Committee "shall have absolute discretion to carry out its responsibilities." (Id. ) In addition, the Committee may delegate all or part of the administrative duties to one or more agents and may retain advisors for assistance. (Id.)

Therefore, the Plan provides a clear grant of discretion to the Committee to administer the Plan. In addition, the Committee may delegate its duties to one or more agents. As a result, decisions by the Committee or an agent to whom the Committee has delegated duties in accordance with the Plan, are reviewed using the arbitrary and capricious standard provided the agent is also given a clear grant of discretion. To this both Parties agree. However, Whaley raises three additional issues regarding the standard of review.

### **"Differential Review Is Not No Review"**

First, Whaley points out that, while the arbitrary and capricious standard is deferential, "it is not, however, without some teeth." *McDonald v. Western-Southern Life Insurance Company*, 347 F.3d 161, 172 (6th Cir. 2003). "'Deferential review is not no review,' and 'deference need not be abject.'" *Id.* (quoting *Hess v. Hartford Life & Accident Insurance Company*, 274 F.3d 456, 461 (7th Cir. 2001)). The Court's obligation includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. *Id.*

**Conflicts of Interest**

Whaley's second issue is that any application of the arbitrary and capricious standard must take into account the conflicts of interest of the decision-makers in this case. A conflict of interest must be weighed as a factor in determining whether the plan administrator's decision was arbitrary or capricious. *Firestone*, 489 U.S. at 115.

A conflict of interest occurs when the company or plan administrator is the insurer that ultimately pays the benefits. *Gismondi v. United Technologies Corp.*, No. 03-2410, slip op. at 3 (6th Cir. May 24, 2005) (citing *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d at 514, 521 (6th Cir. 1998)). For example, a conflict of interest exists where a company both funds and administers a plan because the company incurs a direct expense as a result of the allowance of benefits and it benefits directly from the denial or discontinuation of benefits. *Killian*, 152 F.3d at 521. Also, there is an inherent conflict of interest where a plan is funded by a corporation and the committee that administered the plan was appointed by the corporation's board of directors. *University Hospitals of Cleveland v. Emerson Electric Company*, 202 F.3d 839, 846 (6th Cir. 2000). Finally, a plan administrator who ultimately pays the benefits has a clear incentive to contract with individuals, including physicians, who are inclined to find in its favor. *Calvert v. Firstar Finance, Inc.*, No. 03-5815, slip op. at 5 (6th Cir. May 17, 2005); *Darland v. Fortis Benefits Insurance Company*, 317 F.3d 516, 528 (6th Cir. 2003).

In this case, CNF pays the benefits provided by the Plan from its general assets. (AR at C-0338.) In addition, the Committee that administers the Plan is appointed by CNF's chief executive officer. (AR at C-0335.) The Committee then contracted with VPA to provide

administrative services to the Plan. (Hart 10/13/04 Aff. ¶2.)[2] The Committee also delegated

unwritten authority to CNF's Corporate Benefits Office (the "CBO") to conduct appeals.

(Andersen Aff. ¶8.) The CBO conducted the appeals through its Appeals Committee which

consists of CBO employees. (Id. at ¶7.)

The decision-makers in this case have conflicts of interest and their decisions are

reviewed with this in view. CNF funds the Plan and appoints the members of the Committee that

administer the Plan. Therefore, the Committee has a conflict of interest. The Committee

contracts with VPA to provide administrative services. Therefore, VPA has a conflict of interest.

Finally, the CBO and the Appeals Committee are all employees of CNF so the Appeals

Committee has a conflict of interest.

The Plan responds first that there is no conflict because the plan is self-funded and not

insured. However, this is exactly the conflict of interest contemplated in *Killian*.

The Plan next responds that the employer does not even perform initial claims-handling

and VPA, the entity that performs initial claims handling, is under contract on a flat-fee basis.

However, this is exactly the conflict of interest contemplated in *Darland* where the plan

administrator who also paid the benefits had a clear incentive to contract with a company whose

experts were inclined to find in its favor.

The Plan also argues that the flat-fee contract avoided conflicts. However, regardless of

the manner in which it was compensated, VPA's best interest was to satisfy the Plan so that it

could keep its contract with the Plan. In addition, the contract with VPA provides that if VPA

---

[2]The only exception to the principle of not reviewing evidence outside the AR arises when, as here, consideration of that evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision such as bias on the part of the administrator. *Calvert*, slip op. n.2.

makes any improper payments due to VPA's error, VPA must reimburse the Plan. (Hart 10/13/04 Aff., Ex. A at 2.) Therefore, VPA clearly has a conflict of interest when reviewing applications for benefits.

The Plan also argues that conflicts are avoided because a different entity, the Appeals Committee, conducts the appeal procedure for denied LTD claims. However, the Appeals Committee has a conflict of interest because it consists of CNF employees who are selected by other CNF employees and CNF funds the Plan from its general assets.

Finally, the Plan cites *Peruzzi v. Summa Medical Plan* for the proposition that a conflict of interest is considered only when there is significant evidence that the insurer was motivated by self interest. 137 F.3d 431, 433 (6th Cir. 1998). The plan in *Peruzzi* was self-funded thereby creating a conflict of interest. (*Id.* at 432.) However, the appeals committee that reviewed the plan's decision did not have a financial stake in the outcome. (*Id.* at 433.) The requirement set forth in *Peruzzi* does not apply here because, in this case, the members of the Appeals Committee, as employees of the company that self-funds the Plan, have a financial stake in the outcome.

## Standard of Review for Appeals Committee Decision

Whaley's third issue is that decisions by the Appeals Committee are not entitled to be reviewed under the arbitrary and capricious standard because the Appeals Committee was not granted discretion. Whaley argues that it is not apparent that the decision to uphold the decision to terminate was by the Committee and in accordance with the Plan. However, the letter rejecting Whaley's appeal indicates that it was written on behalf of the Appeals Committee and

was a decision of the Appeals Committee. (AR at C-0001.) The issue then becomes whether the Appeals Committee was acting in accordance with the Plan.

In this case, the Plan grants written authority to the Committee to interpret the Plan. (AR at C-0335.) The Plan also provides in writing that the Committee may delegate all or part of the administrative duties to one or more agents and that the Committee may retain advisors for assistance. (Id.) Finally, the Plan requires that minutes be kept of all proceedings of the committee. (Id.)

The Plan does not specifically identify an appeals committee. However, the Plan has submitted evidence that the authority to review appeals was delegated to the Corporate Benefits Office ("CBO") of the CNF Service Company ("CNFSC"). (Hart 1/11/05 Aff. ¶¶3, 6.) The CBO then reviewed the appeals through an Appeals Committee. (Id. ¶¶6,7.) According to the Hart Affidavit submitted by the Plan, the Appeals Committee conducted appeals of denied disability claims pursuant to an "unwritten delegation of discretionary authority" from the Committee. (Id. ¶7.)

Several provisions of the law are applicable to the unwritten grant of authority from the Committee to the CBO to the Appeals Committee. The law requires that there be a clear grant of discretionary authority before replacing the requirement to engage in a de novo review with the arbitrary and capricious standard. *Wulf*, 26 F.3d at 1373. Also, where a decision is made by an unauthorized body, the decision is reviewed de novo. *Sanford v. Harvard Industries, Inc.*, 262 F.3d 590, 596 (6th Cir. 2001). Finally, the general rule is that written provisions of ERISA plans cannot be altered by oral representations. *Gordon v. Barnes Pumps, Inc*. 999 F.2d 133, 137 (6th Cir. 1993.)

-14-

Pursuant to the Plan, the Committee is authorized to delegate its administrative duties and minutes are to be kept of Committee decisions. However, in this case, there is, as admitted by the Plan, no clear written grant of discretionary authority. In addition, the AR does not include and the Plan has not presented minutes of the proceedings, as required by the Plan, wherein the decision was made by the Committee to delegate discretionary authority to the CBO or to the Appeals Committee. Therefore, since there is no clear grant of discretionary authority in writing from the Committee to the CBO or the Appeals Committee, the Appeals Committee's decision must be reviewed de novo.

The Plan argues that ERISA expressly permits a plan to allow "named fiduciaries" to "designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan. 29 U.S.C. §1105(c)(1), (2). The plan also argues that applicable U.S. Department of Labor regulations in 1999 provided that ERISA claims review fiduciary may be the plan administrator or another person identified pursuant to a procedure in the plan as the person who reviews and makes decisions on claim denials. 29 C.F.R. §2560.503-1(g)(2). In this case, however, the entity that the Plan argues is the "named fiduciary" has not been named a fiduciary in accordance with the Plan language requiring that decisions by the Committee be minuted. The alleged "named fiduciary" was named in an unwritten delegation of authority.

## Conclusion

Decisions by VPA are reviewed using the arbitrary and capricious standard. The Committee was vested with discretionary authority by the Plan and the Committee properly granted discretionary authority to VPA.

When applying the arbitrary and capricious standard, a court is to decide if the plan administrator's decision was rational in light of the plan's provisions. *Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000) (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988), *cert. denied*, 488 U.S. 826 (1988)). A decision is not arbitrary and capricious if it is based upon a reasonable interpretation of the plan. *Johnson*, 970 F.2d at 1574. Indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith and a conflict of interest by the decision-maker. *Caldwell v. Life Insurance Company of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002).

When applying arbitrary and capricious review, courts affirm administrative decisions "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome …." *Davis By and Through Farmers Bank and Capital Trust of Frankfort, Kentucky v. Kentucky Finance Companies' Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990). However, courts should not defer to *post hoc* rationales for denying benefit claims generated for purposes of litigation by plan administrators when those rationales did not appear in the denial letters or in the administrative record. *University Hospitals*, 202 F.3d at n.7.

In addition to a reasonable interpretation of the plan, the administrator's decision must be supported by evidence. *Killian*, 152 F.3d at 520. The decision is upheld if it is "the result of a deliberate principled reasoning process and if it is supported by substantial evidence." *Id.* at 520 (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

While decisions by the Committee and by VPA are reviewed using an arbitrary and capricious standard, decisions by the Appeals Committee are reviewed using the de novo standard. The Appeals Committee was an unauthorized decision-maker that had not been granted discretionary authority by the Committee in accordance with the terms of the Plan.

A de novo review entails taking a "fresh look" at the administrative record without giving deference to the decision by the plan administrator. *Wilkins*, 150 F.3d at 616; *Black's Law Dictionary* (8th ed. 2004). New evidence or a look beyond the administrative record may not be considered. *Wilkins*, 150 F.3d at 616. Finally, the de novo standard applies to the factual determinations as well as to the legal conclusions of the decision-maker. *Id.* at 613. Having set forth the standard of review, the Motions are next analyzed.

## ANALYSIS

Three decisions are relevant to the issues raised by the Parties and the three decisions involve sometimes conflicting evidence from different time periods. While the Parties do not agree on specifically which of the three decisions is to be reviewed and the manner in which they are to be reviewed, all three will be reviewed based upon the AR and the applicable standard of review.

The first to be examined is the Plan's decision on September 21, 1988, to grant Whaley's claim for LTD benefits (the "September 1998 Decision"). The second decision to be examined is the Plan's decision on January 15, 1999, to terminate Whaley's LTD benefits effective February 1, 1999 (the "January 1999 Decision"). The final decision to be examined is the Appeals Committee's decision on June 23, 1999, to deny Whaley's appeal of the January 1999 Decision (the "June 1999 Decision"). Each of the three decisions will be examined in turn.

**The September 1998 Decision**

The September 1998 Decision was made by VPA and is reviewed using the arbitrary and capricious standard. The arbitrary and capricious standard requires the Court to consider whether VPA used a deliberate principled reasoning process and if the process used is supported by evidence and was rational in light of the Plan's provisions. In addition, VPA's conflict of interest must be weighed as a factor in determining whether VPA's decision was arbitrary or capricious.

The September 1998 Decision used September 11, 1997 as the beginning date of disability and approved Whaley's LTD claim through October 31, 1998. (AR at C-0120.) September 11, 1997 was the day after Whaley first took medical leave from her job. (AR at C-0314.)

The letter transmitting the September 1998 decision to Whaley indicates that, "We have completed our review of your appeal and have determined that your Long-Term Disability (LTD) claim is payable." It further states that, "At this time, we have approved your LTD claim through October 31, 1998 and are scheduling two independent medical examinations to determine your current level of function." Nothing more is said in the letter regarding why the LTD benefits are being granted or why they are being granted through October 31, 1998. Presumably, VPA was convinced at the time that Whaley satisfied the Plan requirements for "Totally Disabled" and "Total Disability."

The September 1998 Decision was made after VPA had refused, on April 20, 1998,  to provide LTD benefits based upon medical evidence and evidence that Whaley could perform occupations for which she was reasonably qualified. (AR at C-0173.) After this denial, Whaley asked the Plan to consider the medical information submitted by Dr. Becker and Dr. Fantasia and

-18-

indicated that her condition had worsened since being diagnosed by Dr. Schriber in 1990. (AR at C-0166.) Whaley also provided additional information on fibromyalgia. (Id.)

Following the receipt of Whaley's appeal, the Plan received and reviewed updated records from Dr. Becker and it reviewed a psychiatric report from United Behavioral Health. Dr. Becker, a registered D.O., indicated that he was continuing to see Whaley on a weekly basis and that she had a disability issue due to fibromyalgia. (AR at C-0137-43.)  Dr. Becker's APS dated July 8, 1998, indicates that Whaley had severe fibromyalgia. (AR at C-0144A.)

The records supplied by Dr. Becker include reports from various doctors to whom he had referred Whaley. The dates of the reports range from August 16, 1991, through May 27, 1998. Of note is a report from Dr. Aliya Khan, M.D., dated May 27, 1998, that indicates a diagnosis of fibromyalgia and requires a review of previous laboratory data to confirm this diagnosis. (AR at C-0159.) Also of note is a report from Dr. Gregory Volk, D.O., dated April 28, 1998 that indicates a diagnosis of fibromyalgia. (AR at C-0156.) Finally, Dr. Becker's records include a report from Dr. Wolfe, D.O., dated April 7, 1998, which indicates that Whaley has fibromyalgia. (AR at C-0155.)

The Plan also reviewed a report from United Behavioral Health regarding Whaley. (AR at C–179-85.)  This report was received in April of 1998 and indicates that Whaley is complaining of debilitating fibromyalgia and stress from other events. (Id.) The diagnosis is Dysthemic disorder with symptoms of anxiety and depression due to chronic pain. (Id.)

The AR includes notes that United Behavioral Health was contacted and verified that the only date Whaley was treated was on September 24, 1997. (AR C-0122.) This page of notes also includes an entry that, "Psych intake of 9/25 supports dis due to [??] Chart notes show cognitive

deficit. We don't know current function. Pay to date and schedule IMEs - rheumatologist & psych." (Id.) The Plan now argues that VPA approved Whaley's claim for a short duration "solely" on the basis of this psychiatric report, pending further investigation of the claim.

Regarding its reasoning process, VPA initially determined that Whaley was not entitled to LTD benefits because, based upon a review of the evidence, including a diagnosis of fibromyalgia, and Whaley's capacity to perform occupations for which she was reasonably qualified, she did not satisfy the definition of disability under the Plan as of November 10, 1997. (AR at C-0172-73.) After Whaley appealed, VPA obtained an update from Whaley's doctor that included two additional opinions that Whaley had fibromyalgia.

VPA also reviewed a report from United Behavioral Health. The Plan now argues that VPA concluded from this report that Whaley may be disabled due to Dysthymic disorder and symptoms of anxiety/depression as a result of chronic pain. Therefore, based upon this report, VPA's September 1998 decision was to grant LTD benefits for a period beginning when Whaley took medical leave until a date approximately five (5) weeks following when the September 1998 decision was communicated to Whaley. (AR at C-0120.) VPA also scheduled IMEs with a psychiatrist and a rheumatologist to determine Whaley's current level of function. (Id.)

Since Whaley was ultimately granted benefits from when she began disability leave, the September 1998 Decision cannot be found to be arbitrary and capricious, particularly in light of VPA's conflict of interest. VPA received the United Behavioral Health report sometime in April of 1998 and wanted time to verify the diagnosis in the report.

## The January 1999 Decision

The January 1999 Decision was made by VPA and is reviewed using the arbitrary and capricious standard. The arbitrary and capricious standard requires the Court to consider whether VPA used a deliberate principled reasoning process and if the process used is supported by evidence and was rational in light of the Plan's provisions. In addition, VPA's conflict of interest must be weighed as a factor in determining whether VPA's decision was arbitrary or capricious.

The January 1999 Decision terminated the LTD benefits being paid to Whaley effective February 1, 1999. (AR at C-0091-93.) Although there is no indication of such in the AR, presumably Whaley's LTD benefits were extended from the ending date specified in the September 1999 Decision until February 1, 1999.

The January 1999 Decision was that Whaley did not satisfy the Plan's definition of disability. (Id.) The letter communicating the January 1999 Decision indicates that the decision was made based upon the severity of Whaley's condition and how it would impact her ability to function in any occupation for which she would be reasonably qualified by training, experience or education. (Id.)

When the January 1999 Decision was made, VPA had the Daily Activities Questionnaire and the Employee Assessment Report. Both of these documents were also available when the September 1998 Decision was made.

The Daily Activities Questionnaire was completed by Whaley on December 16, 1997. (AR at C-0253-55.) In response to this Questionnaire, Whaley reported that she drove a car; did not need help getting in or out of the car; did grocery shopping once a week; prepared and cooked meals; cleaned the house and did laundry; sewed on occasion; walked her dogs on nice

days; visited with family once or twice per week; and engaged in a number of outside social activities. (Id.) She also reported that she used heat on sore areas for about 2 hours per day and spent time reading with pillows to support her back and neck. (Id.) In addition, she reported that she had difficulty getting to sleep and woke frequently during the night. (Id.) Finally, she reported that she had trouble concentrating; had "constant pains that most days are merely dulled by medication;" and that she was "more limited in what she could do."(Id.)

The Employability Assessment Report, concluded that Whaley was able to perform work in sedentary jobs for which she was reasonably qualified. The Employability Assessment Report was based upon a review of Whaley's background and medical restrictions available to Rehab West as of February 23, 1998. (AR at C-0223-25.) This Report concluded that Whaley could perform the jobs of procurement clerk, accounting clerk and administrative assistant. (Id.)

In addition to the information that VPA had when it decided to grant Whaley's LTD benefits, VPA received the IMEs from Doctors Moon and Schriber. Dr. Moon found no significant psychiatric problems. (AR at C-0063-68.) Dr. Schriber reported that he suspected that Whaley's complaints were largely functional in nature and noted fibromyalgia syndrome. (AR at C-0069.) Dr. Schriber further indicated that fibromyalgia is generally considered non-disabling. (Id.)

After receiving the IME's, particularly Dr. Moon's, VPA determined that Whaley was not disabled due to a psychiatric disorder. (AP at C-0091-92.) VPA then terminated Whaley's LTD benefits basing this determination upon the two IMEs as well as the previous Employability Assessment Report. (Id.) VPA concluded that Whaley's benefits were being terminated because

-22-

she was able to perform work in sedentary jobs for which she was reasonably qualified and, therefore, did not satisfy the Plan's definition of "Totally Disabled." (Id.)

Both Whaley and the Plan agree that Whaley was suffering from fibromyalgia. The Plan concluded, based upon Dr. Moon's report, that Whaley was not disabled due to a psychiatric disorder as a result of the fibromyalgia or anything else. Whaley agrees with this conclusion.

The evidentiary basis for VPA's January 1999 Decision consisted of the Daily Activities Questionnaire completed on December 16, 1997, the Employability Assessment Report prepared on February 23, 1998, and the two IMEs that were completed on October 29, 1998, and November 24, 1998. VPA decided from this evidence that Whaley did not satisfy the Plan's definition of "Totally Disabled." The review then turns upon whether VPA used a deliberate principled reasoning process in arriving at this decision.

The Daily Activities Report was thirteen (13) months old at the time and the Employability Assessment Report was eleven (11) months old at the time of the January 1999 Decision. Further, between the date the Daily Activities Questionnaire was received and the January 1999 Decision, the AR includes a significant amount of additional information received by VPA in regard to Whaley's condition.

The additional information in the AR includes an APS from Dr. Wolfe dated January 24, 1998 indicating that Whaley has fibromyalgia and has difficulty concentrating. (AR at C-0240-41.) There is a letter from Whaley sent sometime after May 15, 1998, wherein she indicates that the severity of pain in all areas of her body has increased. (AR at C-0203.) There is a letter dated March 23, 1998, from Dr. Wolfe indicating that Whaley's condition has worsened, that she has some decrease in function and that she has at least 12 out of 18 possible trigger points for

fibromyalgia. (AR at C-0186.) The AR includes another letter from Whaley dated April 27, 1998, wherein she indicates that the chronic pain from fibromyalgia is constant. (AR at C-0166.) The AR also includes a letter from Dr. Wolfe dated April 7, 1998, wherein he indicates that Whaley has begun to have increasing pain, stiffness and fatigue which has been difficult to get back under control. (AR at C-0155.) There is an APS from Dr. Becker dated July 8, 1998, reporting that Whaley has severe fibromyalgia and shows decreased functional capabilities from previous reports. (AR. at C-0144A.) Finally, Dr. Schriber conducted an IME and reported on November 24, 1998 that he suspected that Whaley's complaints were largely functional in nature. (AR at C-0087.)

In the thirteen (13) months following Whaley's completion of the Daily Activities Questionnaire, VPA received several indications from Whaley, her doctors and the doctor that they employed to conduct the IME, that Whaley was experiencing reduced function. Yet VPA elected not to update the Daily Activities Questionnaire or the Employability Assessment Report. This, particularly when viewed in light of VPA's conflict of interest, is not a deliberate, principled reasoning process. Therefore, the January 1999 Decision was arbitrary and capricious.

## The June 1999 Decision

The June 1999 Decision was made by the Appeals Committee and is reviewed using the de novo standard. Application of the de novo standard requires the Court to take a "fresh" look at the evidence in the AR in light of the Plan's provisions.

The June 1999 Decision concurred with VPA's January 1999 Decision. (AR at C-0001-02.) The Appeals Committee determined that, based upon its review, there was no indication of a disease process which would preclude sedentary/light work activities.(Id.)

-24-

The AR includes the documentation that was available to VPA when it made its January 1999 Decision and additional correspondence and reports requested and received after the January 1999 Decision. The additional documentation includes a letter dated February 12, 1998, from Whaley indicating that her symptoms have worsened. (AR at C-0089.) VPA also received updated records from Dr. Becker. (AR at C-0038.) Dr. Becker's records indicate that Whaley continued to have osteopathic manipulation therapy on a monthly basis. (Id.) A whole body scan on April 13, 1999, indicated a degenerative process bilaterally in the shoulder joints and minimally in the thoracolumbar spine. (Id.) There were also foci of increased activity in the right knee (probable arthritic changes) and the bilateral first metatarsal phalangeal joints (feet) which are probably due to arthritis. (AR at C-0070.)

In addition to the specifics of this case, both Parties refer to LTD claims based upon fibromyalgia that have been addressed by courts and are relevant to a de novo review. For example, the Seventh and the Ninth Circuits have examined such claims based. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003).

Fibromyalgia is described as an "elusive and mysterious" disease whose cause or causes are unknown. *Hawkins*, 326 F.3d at 916. Further, there is no cure and its symptoms are entirely subjective. *Id.* The principal symptoms of fibromyalgia are pain all over, fatigue, disturbed sleep, stiffness and multiple tender spots at fixed locations on the body. *Id.* Finally, and most important to this case, some people may have such a severe case of fibromyalgia as to be totally disabled from working and most do not. *Id.; see also, Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).

In *Hawkins*, the claimant had worked for a period of time despite having fibromyalgia and there was no indication that the condition worsened during this period of time. *Id.* at 918. The claimant then sought LTD benefits. The Seventh Circuit opined that working for a period of time should not prevent one who suffers from fibromyalgia from becoming disabled because a desperate person might force himself to work despite an illness that everyone agreed was totally disabling. *Id.* Yet, even a desperate person might not be able to maintain the necessary level of effort indefinitely. *Id.*

In *Jordan*, the Ninth Circuit determined that "somebody has to make a judgment as to whether a medical condition prevents a person from doing her work…" and the plan generally assigns the discretion to the claims administrator. *Jordan*, 370 F.3d at 878. Further, with a condition such as fibromyalgia, where the applicant's physician's diagnoses depend primarily upon the applicant's pain reports, the applicant's physician's conclusions cannot be unchallengeable. *Id.* The plan administrator's rejection of the applicant's physician's views does not mean that they were ignored. *Id.* However, the plan administrator must come forward with specific reasons for ignoring the applicant's physician's conclusions based upon substantial evidence on the record. *Id.*

In this case, the Plan's basis for denying Whaley's LTD claim is focused on the Plan's conclusion that, even with fibromyalgia, she was able to perform sedentary/light work activities and thus was not disabled pursuant to the requirements of the Plan. This conclusion is based primarily upon a Daily Activity Questionnaire completed by Whaley on December 16, 1997, and an Employability Assessment Report completed by a consultant employed by VPA on February

23, 1998. The opinion rendered in the Employability Assessment Report was based upon a review of Whaley's background and medical history at the time.

Here, the Plan recognizes that it is obligated to make an individual determination regarding Whaley's disability and that fibromyalgia may or may not be debilitating. In addition, much is now made by the Plan of the alleged escalation in Whaley's symptoms after her LTD claim was denied. The Plan also argues that, in cases involving fibromyalgia, it cannot rely upon only reports from the claimant's doctors. Yet, after receiving additional evidence from Whaley and her doctors regarding a decrease in Whaley's functionability and becoming suspicious of Whaley's loss of functionability, neither the Committee, VPA nor the Appeals Committee elected to update the Daily Activities Questionnaire or the Employability Assessment Report.

After the completion of the Daily Activity Questionnaire and the associated Employability Assessment Report, the AR includes evidence that Whaley's condition worsened and her ability to function decreased. Since fibromyalgia is a disease that may be disabling to some and not to others, the Appeals Committee should have, as a minimum, obtained an updated Daily Activity Questionnaire and Employability Assessment Report to form a basis for acceptance or rejection of Whaley's appeal. The updated information may have provided specific reasons for ignoring the additional evidence in the AR.

The AR includes evidence that Whaley's ability to function worsened after the initial Daily Activity Questionnaire and Employability Assessment Report, that these reports were not later updated and that Whaley later became disabled due to fibromyalgia. Therefore, the only conclusion that can be reached from a de novo review of the AR is that Whaley may not initially have been disabled in accordance with the Plan but she later became disabled.

-27-

## SUMMARY

VPA's September 1998 Decision to approve Whaley's LTD claim through October 31, 1998, was not arbitrary and capricious. It is supported by evidence and is rational in light of the Plan's provisions.

VPA's January 1999 Decision to deny Whaley's LTD claim is arbitrary and capricious. While there is some evidence from which VPA could conclude that Whaley was not entitled to LTD benefits, VPA did not use a deliberate principled reasoning process in reaching this conclusion, particularly in light of VPA's conflict of interest.

Finally, the Appeals Committee's June 1999 Decision does not survive a de novo review. The AR includes evidence that Whaley may not have satisfied the Plan's definition of "Totally Disabled" when the Daily Activity Questionnaire and the Employability Assessment Report were completed. However, subsequent evidence that was unrefuted, indicates that her condition worsened and she later became disabled in accordance with the Plan provisions.

As a result, Whaley's Motion for Judgment On the Administrative Record (Doc. #24) is GRANTED and the Plan's Motion for Judgment On the Administrative Record (Doc. #37)  is OVERRULED. Whaley's LTD claim is ordered reinstated. The Plan is ordered to pay LTD benefits to Whaley for as long as she remains disabled under the terms of the Plan.

Whaley is given until not later than thirty (30) days from entry of this order to submit a motion requesting any interest on past due benefits, attorneys' fees and other benefits to which she may believe that she is entitled under ERISA. This motion should be supported by reference to legal authorities and appropriate evidence.

**DONE** and **ORDERED** in Dayton, Ohio, this Fourteenth day of June, 2005.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record